IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| BNSF RAILWAY CO.,<br><br>  Plaintiff and Counter Defendant,<br><br>  vs.<br><br>TOLTZ, KING, DUVALL, ANDERSON<br>AND ASSOCIATES, INC.,<br><br>  Defendant and Counter Claimant, | CV 16–24–M–DLC<br><br><br>ORDER |
| TOLTZ, KING, DUVALL, ANDERSON<br>AND ASSOCIATES, INC.,<br><br>  Third Party Plaintiff,<br><br>  vs.<br><br>SAFE HARBOR ACCESS SYSTEMS,<br>LLC; SAFE HARBOR ACCESS<br>SYSTEMS II, LLC; SAFE HARBOR<br>ACCESS SYSTEM Ii, a/k/a SAFE<br>HARBOR Ii,<br><br>  Third Party Defendants. | |

Before the Court are a number of motions, including Defendant TKDA's

Motion for Partial Summary Judgment Regarding Application of Montana Law

(Doc. 24); Plaintiff BNSF's Cross Motion for Partial Summary Judgment Striking

TKDA's Defense Under Montana Code Annotated § 28–2–2111 (Doc. 34); and

Defendant TKDA's Motion for Partial Summary Judgment Regarding Invalidity of Indemnity and Release of Claims Provisions (Doc. 42).[1]  This Order resolves all of these motions.  For the reasons explained below, Defendant TKDA's motion for partial summary judgment regarding the application of Montana law is granted, Plaintiff BNSF's motion striking TKDA's affirmative defense under Montana Code Annotated § 28–2–2111 is denied, and TKDA's motion regarding the invalidity of the indemnity and release of claims provisions is denied.

## BACKGROUND AND PROCEDURAL HISTORY

Stated simply, this case involves TKDA's alleged duty to indemnify BNSF for claims arising out of an accident that occurred in 2011 involving a BNSF employee who was injured while working on a fuel unloading dock at the BNSF railroad yard in Whitefish, Montana.  On August 23, 2001, BNSF and TKDA entered into a non-exclusive contract in which TKDA agreed to provide engineering services necessary for the completion of work defined by BNSF (hereafter referred to as the "2001 Agreement").  (Doc. 27-1).  Pursuant to the 2001 Agreement, TKDA was to indemnify and hold BNSF harmless for "any

---

[1] Defendant and Counterclaimant Tolz, King, Duvall, Anderson and Associates, Inc. will be referred to as "TKDA"; Plaintiff and Counter-defendant BNSF Railway Co. will be referred to as "BNSF"; Third Party Defendants Safe Harbor Access Systems, LLC, and Safe Harbor Access Systems II, LLC, will be referred to as "Safe I" and "Safe II," respectively.  Safe I and Safe II have joined in TKDA's motion for partial summary judgment regarding the invalidity of indemnity and release of claims provisions.  (Docs. 46, 47.)

claims arising from the performance of th[e] Agreement."  The contract also

included the following choice of law provision: "All questions arising under this

Agreement shall be decided according to the laws of the State in which the work is

performed."  (Doc. 27-1 at 11.)  The 2001 Agreement was renewed in 2003, 2004,

2005, 2006, 2008, and January 21, 2009, which was the final renewal of the 2001

Agreement.  (Docs. 39-1, 39-2, 39-3, 39-4, 39-5, 39-6.)

In 2002, pursuant to the 2001 Agreement, TKDA agreed to engineer a fuel

unloading facility at the BNSF railway yard in Whitefish, Montana.  TKDA

contracted to provide an elevated walkway for top-unloading tank cars with

retractable gangways and new fuel unloading arms at the two tank car unloading

locations.  TKDA purchased supply equipment for the two gangway platforms

from Safe I.  These platforms were designed to allow BNSF employees to access

the tops of tank cars and had an integrated fall protection system that would retract

with the walkway in order to provide a safety barrier.

On October 6, 2009, BNSF and TKDA entered into another contract for

services which stated that TKDA was to "release Railroad from any claims arising

from the performance of th[e] Agreement" and "[t]he Indemnification obligation

assumed by consultant shall include any claims, suits or judgments brought against

Railroad under the Federal Employer's Liability Act" (hereafter referred to as the

"2009 Agreement").  (Doc. 35-2.)  The choice of law provision in the 2009 Agreement stated: "All questions arising under this Agreement shall be decided according to the laws of the State of Texas."  The 2009 Agreement also explained that, "Railroad and Consultant agree that all existing prior or contemporaneous written or oral agreements between the two firms that cover the same general service work in the same locations(s) as this Agreement shall be superseded and canceled by this Agreement."  (Doc. 35-2 at 21.)

On July 19, 2013, Terry Fox ("Fox"), a BNSF employee, sustained injuries after falling off of a tank car while attempting to remove fuel at the Whitefish, Montana fuel unloading facility.  Fox filed suit against BNSF in Montana state district court claiming that the gangway platform engineered by TKDA retracted and knocked him off of the tank car.  Fox asserted that BNSF had a non-delegable duty to provide a safe work place and that Fox's injuries were caused by the negligence of BNSF and its employees.  BNSF tendered the lawsuit to TKDA and demanded that TKDA indemnify and defend BNSF in the litigation.  TKDA did not respond to the requests by BNSF to defend and indemnify Fox's claims.

BNSF filed its Complaint against TKDA in this case on February 16, 2016, alleging multiple claims, including breach of contract, breach of the duty of good faith and fair dealing, and further seeking a declaration that TKDA violated

Montana's statutory right for indemnification.  On March 22, 2016, TKDA filed its answer, denying all allegations and contending that BNSF's claims are barred by Montana and Minnesota statutory law regarding indemnity and claims handling procedures, among sixteen additional affirmative defenses.  Further, TKDA filed a counterclaim against BNSF seeking a declaratory judgment from the Court regarding the indemnity and release of claim provisions within the contract, and filed a third-party complaint against the Safe Harbor Defendants alleging negligence.  The parties then filed the motions described above.

## LEGAL STANDARD

A party is entitled to summary judgment if it can demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Summary judgment is warranted where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251 (1986).  Only disputes over facts that might affect the outcome of the lawsuit will preclude entry of summary judgment; factual disputes that are irrelevant or unnecessary to the outcome are not considered.  *Id.* at 248.  In ruling on a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party."  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398

U.S. 144, 157 (1970)).  "[T]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Id.* at 1863 (quoting *Anderson*, 477 U.S. at 255).

"[W]hen parties submit cross-motions for summary judgment, each motion must be considered on its own merits."  *Fair Hous. Council of Riverside Co., Inc. v. Riverside Two*, 249 F.3d 1132, 1136 (9th Cir. 2001) (citations omitted).  "The court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the Rule 56 standard."  *Id.* (quoting Charles Alan Wright et al., *Federal Practice and Procedure* vol. 10A, § 2720 (3d ed. West 2014)).  "In fulfilling its duty to review each cross-motion separately, the court must review the evidence submitted in support of each cross-motion."  *Id.*

## ANALYSIS

The parties do not dispute that the TKDA's design work on the Whitefish fuel unloading dock occurred in 2002 and is therefore subject to the 2001 Agreement.  However, the parties do contest the applicability of the 2009 Agreement which impacts the Court's analysis on the choice of law issue, that is, does Montana or Texas law govern this dispute.  Further, both parties contend that judicial admissions and judicial estoppel favor their respective positions.  The

Court analyzes each motion for summary judgment based on the agreements,

underlying facts, and applicable law.[2]

## I.     Judicial Estoppel and Judicial Admissions

Significant briefing by the parties is dedicated to the representations each

have made in various filings, arguing that these representations constitute

admissions which the parties are now estopped from denying.  For example,

TKDA argues that BNSF is estopped from arguing that the work at issue was

performed in a state other than Montana or that another state's law applies because

BNSF expressly alleged in its preliminary pretrial statement that Montana law

should apply.  TKDA also argues that in BNSF's preliminary pretrial statement,

BNSF admitted to the place where the project work was performed and that the

Court should consider this statement a judicial admission.  BNSF contends that

because TKDA selectively quoted BNSF's representations in its preliminary

pretrial statement that judicial estoppel does not apply.  Further, BNSF alleges that

TKDA is itself judicially estopped from taking the position that the 2009

_____

[2] There is brief discussion between the parties on whether BNSF properly filed its motion under Federal Rule of Civil Procedure 56 instead of Rule 12(f).  (Docs. 40 at 2-4, 45 at 2-3.) TKDA contends that if filed under Rule 12(f), BNSF's motion would be untimely.  BNSF claims that partial summary judgment may be used as a mechanism to dispose of a factually unsupported affirmative defense. (Doc. 45 at 3.)  The Court finds that it is procedurally proper for BNSF to file a motion for partial summary judgment seeking to strike an affirmative defense. *See  Moore v. Safeco Ins. Co. of Am.*, 549 F. App'x 651, 654 (9th Cir. 2013); *Baldwin v. Trailer Inns, Inc.*, 266 F.3d 1104, 1111 (9th Cir. 2001).

Agreement was not a renewal of the 2001 Agreement because TKDA admitted that it was a renewal in its preliminary pretrial statement.

Judicial estoppel "is an equitable doctrine invoked by a court at its discretion." *United States v. Liquidators of European Fed. Credit Bank*, 630 F.3d 1139, 1148 (9th Cir. 2011). It "prevents a party from prevailing in one phase of a case on an argument and then relying on a contradictory argument to prevail in another phase." *Zedner v. United States*, 547 U.S. 489, 504 (2006). "Judicial estoppel not only bars inconsistent positions taken in the same litigation, but bars litigants from making incompatible statements in two different cases." *United Nat. Ins. Co. v. Spectrum Worldwide, Inc.*, 555 F.3d 772, 778 (9th Cir. 2009) (internal citations and quotations omitted). To determine whether to apply the doctrine, a district court typically considers: "(1) whether a party's later position is clearly inconsistent with its original position; (2) whether the party has successfully persuaded the court of the earlier position; and (3) whether allowing the inconsistent position would allow the party to derive an unfair advantage or impose an unfair detriment on the opposing party." *Liquidators of European Fed. Credit Bank*, 630 F.3d at 1148 (internal citations and quotations omitted).

The significance of the parties' admissions turns on the issue of which agreement governs this dispute—is it the 2001 Agreement, or the 2009

Agreement?  In its preliminary pretrial statement, BNSF said the following:

**G. PROPOSED STIPULATIONS OF FACT AND UNDERSTANDING AS TO WHAT LAW APPLIES**

The contract between BNSF and TKDA specifically states the law where the work is performed shall decide all questions arising under the contract. Therefore, Montana law would govern interpretations of the 2001 contract. To the extent TKDA contends that the contract was renewed or modified by a 2009 agreement that alters the liabilities assumed by TKDA, then Texas law applies based on the parties' agreement in the 2009 contract. The parties have filed a Statement of Stipulated Facts.

(Doc. 18 at 6.)  In its brief for partial summary judgment, TKDA omitted the

language that BNSF preserved its ability to argue that Texas law applies if the

2009 Agreement was found to be a renewal of the 2001 Agreement.  Therefore,

BNSF was not unequivocally stating that Montana law applied; Montana law

applied only if the 2001 Agreement was the contract interpreting the conduct at

issue.  Therefore, BNSF is not precluded from arguing that Texas law applies if

the Court determines the 2009 Agreement is the correct contract to interpret the

conduct at issue here.

TKDA further contends that because BNSF made the judicial admission that

the subject work was performed in Montana and that the parties' contract requires

Montana law to govern the interpretation of the 2001 Agreement in its preliminary

pretrial statement, the Court should take notice of this statement.  Factual

assertions in pleadings and pretrial orders, unless amended, constitute judicial admissions. *Am. Title Ins. Co. v. Lacelaw Corp.*, 861 F.2d 224, 226 (9th Cir. 1988). The Court agrees that BNSF admitted the work at issue was performed by TKDA in Montana, and thus under the 2001 Agreement Montana law would apply. Therefore, the Court finds that BNSF is bound by this judicial admission.

## II.   Partial Summary Judgment Regarding the Choice of Law Provisions

With these judicial admissions in mind, the Court must first determine whether the choice of law provision in the 2001 Agreement or the 2009 Agreement governs this case. The Court has subject matter jurisdiction over this case due to the diversity of the parties under 28 U.S.C. § 1332, and therefore must apply state substantive law to the state law claims. *Mason and Dixon Intermodal, Inc. v. Lapmaster Intern. LLC*, 632 F.3d 1056, 1060 (9th Cir. 2011). Again, the parties disagree as to which state's substantive law should apply. TKDA contends Montana law applies, while BNSF agrees that the claims should be decided under Montana law if the Court finds that the 2001 Agreement applies but also argues that the claims should be decided under Texas law if the 2009 Agreement is the governing contract.

First and foremost, the Court must determine which agreement applies. Since the conduct at issue—TKDA's installment of the fuel unloading dock in

2002—falls under the 2001 Agreement, the issue is whether the 2009 Agreement

was a new contract or a renewal of the 2001 Agreement.  If it is a renewal, then the

2009 Agreement is the proper contract to govern the issues in this case.

The 2001 Agreement, which was executed on August 23, 2001, is the first

contract between BNSF and TKDA.  The parties entered into renewal agreements

in 2003, 2004, 2005, 2006, 2008, and January 21, 2009.  The confusion in the

parties briefing is the difference between the January 21, 2009 renewal agreement

and the October 6, 2009 contract.  BNSF claims that when TKDA stated in its

Answer that "[b]etween 2003 and 2009 the BNSF Contract was renewed by the

parties," TKDA admitted that the 2009 Agreement renewed the 2001 Agreement;

thus, TKDA should now be estopped from asserting a different position in its

briefing.  (Doc. 4 at 10.)  BNSF contends that TKDA's position that the 2009

Agreement is a renewal and governs the issues in this case is contrary to TKDA's

argument in its motion for partial summary judgment that the 2001 Agreement is

the applicable contract.  TKDA cleared this up in its reply brief by explaining that

the "2009" it referred to was the January 21, 2009 renewal and not the October 6,

2009 contract.  TKDA maintains that the 2009 Agreement is not in any way a

renewal of the 2001 Agreement.  (Doc. 38 at 6.)  BNSF concedes this point.  (Doc.

45 at 12.)  The Court agrees with TKDA that it was not taking inconsistent

positions, and that the "2009" it referred to when it stated "[b]etween 2003 to 2009" was in reference to the renewal agreements and not the 2009 Agreement executed on October 6, 2009.  Thus, because there is no dispute that the 2009 Agreement was a separate and distinct contract, the Court concludes that the 2001 Agreement applies to the conduct at issue in this case.

Montana courts do not engage in a choice of law analysis unless there is "an actual conflict between [the different states] with respect to the contract and tort claims."  *Masters Grp. Int'l, Inc. v. Comerica Bank*, 352 P.3d 1101 (Mont. 2015).  The 2001 Agreement's choice of law provision states, "All questions arising under this Agreement shall be decided according to the laws of the State in which the work is performed."  TKDA contends that performance under the 2001 Agreement occurred in both Montana and Minnesota.  Consequently, if there was a dispute, the Court must examine whether there is an actual conflict between Montana and Minnesota law as to the enforceability of the indemnity provisions in the 2001 Agreement.  However, as TKDA explains, there is no conflict between Montana law and Minnesota law regarding the enforceability of the indemnity provision.  Because the Court previously determined that BNSF is bound by its judicial admission that the work at issue was performed by TKDA in Montana, the choice of law analysis is straightforward.  The work was done pursuant to the

2001 Agreement, the majority of the work was performed in Whitefish, Montana, and, therefore, the law of Montana, as the forum state, applies.

## III. Partial Summary Judgment Regarding TKDA's Affirmative Defense Under Montana Code Annotated § 28–2–2111.

Since Montana law applies, the Court must now determine if TKDA can assert an affirmative defense under Montana Code Annotated § 28–2–2111. BNSF argues that Montana Code Annotated § 28–2–2111 is not applicable here if the 2001 Agreement was not renewed after 2003, because the statute is only applicable to contracts that were entered into or renewed on or after July 1, 2003. (Doc. 35 at 13.)  Both parties agree that the statute applies to construction contracts only if those contracts are entered into or renewed on or after July 1, 2003.

Hence, the issue is whether the 2001 Agreement was renewed in 2003, 2004, 2005, 2006, 2008, and 2009.  "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other."  Mont. Code Ann § 28–3–202.[3]  The Montana Supreme Court described the rules of contract interpretation as follows:

_____

[3] The parties also rely on Ninth Circuit case law to support their positions on the correct definition of a "renewal."  However, since Montana substantive law applies here, the Court will apply Montana law to the facts to resolve this issue.

> The construction and interpretation of a contract is a question of law. *Mary J. Baker Revoc. Trust v. Cenex Harvest*, 2007 MT 159, ¶ 19, 338 Mont. 41, 164 P.3d 851. "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." Section 28–3–301, MCA. "When a contract is reduced to writing, the intention of the parties is to be ascertained from the writing alone if possible, subject, however, to the other provisions of this chapter." Section 28–3–303, MCA. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable, each clause helping to interpret the other." Section 28–3–202, MCA. "The language of a contract is to govern its interpretation if the language is clear and explicit and does not involve an absurdity." Section 28–3–401, MCA; *see also Carelli v. Hall*, 279 Mont. 202, 209, 926 P.2d 756, 761 (1996) ("Where the language of an agreement is clear and unambiguous and, as a result, susceptible to only one interpretation, the duty of the court is to apply the language as written.").

*Richards v. JTL Grp., Inc.*, 212 P.3d 264, 269 (Mont. 2009.)  The Montana Supreme Court has also found that, "[t]he word 'renewed' or 'renewal,' as applied to promissory notes in commercial and legal parlance, means something more than the substitution of another obligation for the old one.  It means to re-establish a particular contract for another period of time, to restore to its former condition an obligation on which the time of payment has been extended."  *Parchen v. Chessman*, 164 P. 531, 532 (Mont. 1917).

The plain language of the 2001 Agreement states that each year the contract could be renewed subject to a new rates and compensation schedule:

V.      PAYMENT PROVISIONS

. . .

>    (2)    The labor multipliers, volume threshold and associated
>    discounts and prompt payment terms and associated
>    discounts contained in Exhibit "B" will remain in effect
>    until December 31, 2001 and will be renewed effective
>    January 1, 2002 and every January 1 thereafter for the
>    term of this Agreement.  Prior to December 31st, the
>    Consultant's multipliers, volume discounts and prompt
>    payment discounts will be renegotiated effected the
>    following January 1st.  In the event negotiations do not
>    occur, or in the event the parties are unable to come to a
>    mutual agreement, current prices then in effect will
>    continue to apply.
>
>    (3)    The "Consultant Compensation Schedule for Billable
>    Chargeout Rates", contained in **Exhibit "B"**, will be in
>    effect until December 31, 2001 and will be renewed
>    January 1st of each year.  All rate changes will be effect
>    by mutual written agreement, which will become a part
>    of this Agreement.

(Doc. 27-1 at 11–12.)  TKDA asserts that these provisions contemplate subsequent

renewals of the 2001 Agreement subject to new payment rates.  (Doc. 40 at 6–7.)

BNSF contends that the use of the term "renewal" in these paragraphs has no

actual impact on whether the 2001 Agreement was extended or terminated.  The

Court disagrees.  When examined in its ordinary sense, the term "renewed" here

means that each year the parties could renegotiate rates and compensation.  This

clearly anticipates the mutual agreement of the parties to renew the contract every

-15-

year, subject to certain slight modifications.

Furthermore, the supplemental agreements all expressly reference and re-incorporate the 2001 Agreement as the "Original Contract."  The supplements in 2003, 2004, 2005, 2006, 2008, and January 21, 2009, consisted of cover pages titled "Supplement Original," and included additional language as "revisions" to the 2001 Agreement.  (Docs. 39-1, 39-2, 39-3, 39-4, 39-5, 39-6.)  The revisions consisted of updated payment provisions.  The last paragraph of each supplemental agreement states that "the 'Original Contract' shall continue in full force and effect."  Thus, the Court finds that there is no genuine issue of material fact that the 2003, 2004, 2005, 2006, 2008, and January 21, 2009 agreements were renewals of the 2001 Agreement.

Consequently, TKDA's affirmative defense under Montana Code Annotated § 28–2–2111 will not be stricken.  However, as explained in the last section of this Order, this holding is an "empty victory" in that the statute cannot be applied retroactively to work performed before the statute's effective date.

## IV.   Partial Summary Judgment Regarding the Invalidity of Indemnity and Release of Claims Provisions

The usual principles of contract interpretation apply in this case.  It is well-established in Montana that the "construction and interpretation of a contract is a

question of law" for the court to decide.  *Corporate Air v. Edwards Jet Center*, 190

P.3d 1111, 1120 (Mont. 2008).  When "the language of an agreement is clear and

unambiguous, and as a result, susceptible to only one interpretation, the court's

duty is to apply the language as written."  *Rich v. Ellingson*, 174 P.3d 491, 495

(Mont. 2007).  The court is to "'give effect to the mutual intention of the parties as

it existed at the time of contracting, so far as the same is ascertainable and

lawful.'"  *Corporate Air*, 190 P.3d at 1120 (quoting Mont. Code Ann. § 28-3-301).

To that end, the court must read the contract as a whole, giving "effect to every

part if reasonably practicable, each clause helping to interpret the other."  *K&R*

*Partnership v. City of Whitefish*, 189 P.3d 593, 600 (Mont. 2008) (quoting Mont.

Code Ann. § 28-3-202).  If the terms of a contract are clear, "the court must

determine the intent of the parties from the wording of the contract alone." *Rich*,

174 P.3d at 495.

The 2001 Agreement contains the following indemnity provisions:

Consultant shall indemnify and hold harmless Railroad for all
judgments, awards, claims, demands, and expenses (including
attorneys' fees), for injury or death to all persons, including
Railroad's and Consultant's officers and employees, and for loss and
damage to property belonging to any person, arising in any manner
from Consultant's or any of Consultant's subconsultants' acts or
omissions or failure to perform any obligation hereunder.  THE
LIABILITY ASSUMED BY CONSULTANT SHALL NOT BE
AFFECTED BY THE FACT, IF IT IS A FACT, THAT THE

DESTRUCTION, DAMAGE, DEATH, OR INJURY WAS
OCCASIONED BY OR CONTRIBUTED TO BY THE
NEGLIGENCE OF RAILROAD, ITS AGENTS, SERVANTS,
EMPLOYEES OR OTHERWISE, EXCEPT TO THE EXTENT
THAT SUCH CLAIMS ARE PROXIMATELY CAUSED BY THE
INTENTIONAL MISCONDUCT OR GROSS NEGLIGENCE OF
RAILROAD.

. . .

Consultant agrees to release Railroad from any claims arising from
the performance of this Agreement which Consultant or any of its
employees, subconsultants, agents or invitees could otherwise assert
against Railroad, regardless of the negligence of railroad, except to
the extent that such claims are proximately cause by the intentional
misconduct or gross negligence of Railroad.

. . .

If any portion of the operation is to be subcontracted by Consultant,
Consultant shall require that the subcontractor shall provide and
maintain insurance coverage as set forth herein, naming Railroad as
an additional insured, and shall require that the subcontractor shall
release, defend and indemnify Railroad to the same extent and under
the same terms and conditions as Consultant is required to release,
defense and indemnify Railroad herein.

TKDA first contends that these provisions are invalid because under

Montana Code Annotated § 28–2–702 any contract provision that directly or

indirectly exempts a party from responsibility for their own willful or negligent

conduct is void as a matter of public policy.  Next, TKDA similarly contends that

under § 28–2–2111 a construction contract provision which requires one party to

indemnify the other for damages or losses caused by the "the negligence, recklessness, or intentional misconduct of the other party" violates public policy. BNSF argues that these two statutes do not apply to the 2001 Agreement. The Court will analyze each theory individually.

### A.     Montana Code Annotated § 28–2–702

Montana Code Annotated § 28–2–702 states:

> [A]ll contracts that have for their object, directly or indirectly, to exempt anyone from responsibility for the person's own fraud, for willful injury to the person or property of another, or for violation of law, whether willful or negligent, are against the policy of the law.

The parties do not dispute the application of this statute at the time the contract was enacted in 2001, but BNSF contends that the statute does not render the indemnity provision in the 2001 Agreement invalid and unenforceable.

In its opening brief, TKDA asserts that under § 28–2–702 a contract may not exempt a party from liability for their negligent acts. TKDA cites to two leading cases in this area: *Miller v. Fallon County*, 721 P.2d 342 (Mont. 1986) and *Spath v. Dillon Enterprises, Inc.*, 97 F.Supp.2d 1215 (D. Mont. 1999). In *Miller*, Linda Miller was injured in a vehicle accident when her husband, Cecil Miller, was driving. 721 P.2d at 343. Cecil was an independent truck driver and contracted with PreFab Transit Co. to deliver mobile home frames. Linda sued

-19-

Fallon County, her husband, Davis Transport, Inc., and PreFab for negligence.

PreFab Transit Co. filed a motion for summary judgment arguing that in its

contract with Linda Miller—a contract that PreFab had her sign in order to ride

with her husband in the truck—she had signed a release form that absolved PreFab

from any liability.  The waiver stated in pertinent part:

> Furthermore in the event of an accident or other manner wherein I
> may lose my life, be injured, or in any way contribute to the injury or
> loss of life to another, I hereby waive any rights whatsoever against
> Pre-Fab Transit Co. for what otherwise might be its liability and agree
> that Pre-Fab Transit Co., its agents, employees and contractors are to
> be held harmless in all respects by virtue of my being a passenger in
> said vehicle.

*Id*. at 345–346.  The Montana Supreme Court interpreted § 28–2–702 in *Miller*

and found that the statute "is interpreted to mean that no person or corporation

may contract to exempt himself or itself from responsibility for his, its or its

employee's: (1) fraud; (2) willful injury to the property or person of another; (3)

negligent or willful violation of law."  *Id*. at 346.  Thus, "pursuant to the clear and

unambiguous language of § 28–2–702, MCA, an entity cannot contractually

exculpate itself from liability for willful or negligent violations of legal duties,

whether they be rooted in statutes or case law."  *Id*.  Consequently, the Court

found PreFab's release clause unenforceable.

In *Spath*, United States District Court Judge Donald W. Molloy found that

*Miller v. Fallon County* controlled the disposition.  97 F.Supp.2d at 1216.  Before

embarking on a fatal white water rafting trip organized and run by the defendant,

Robert Spath signed a "participant agreement" that released the company, Dillon

Enterprises, from any liability.  The participant agreement stated:

> Paragraph Two: I hereby voluntarily release, forever discharge, and
> agree to indemnify and hold harmless [ABS] from any and all claims
> .... **including any such Claims which allege negligent act or
> omission of service** (emphasis in original).

*Id*. at 1217.  On cross-motions for summary judgment, Judge Molloy looked to

*Miller* and found that Montana law prohibits exculpatory provisions contained in

contracts.  *Id*.  Thus, the release provision in the contract was invalid and

unenforceable under Montana Code Annotated § 28–2–702 because it purported to

exculpate the defendant from all liability for its own negligence.  *Id*. at 1218.

 BNSF contends that § 28–2–702 applies only to exculpatory clauses and

not indemnification agreements.  For support, BNSF relies on *Safeco Ins. Co. Of

Am. V. Liss,* 16 P.3d 399 (Mont. 2000), *Haynes v. County of Missoula*, 517 P.2d

370 (Mont. 1973), and *Ryan Mercantile Co. v. Great Northern Railway Co.*, 294

F.2d 629 (9th Cir. 1961), for the proposition that indemnity provisions are

typically enforceable.  The *Safeco* Court noted that § 28–2–702 was adopted

verbatim from California law, and that California similarly held that its statute was

not applicable to indemnity agreements.  *Safeco*, 16 P.3d at 404.  In *Haynes*, the

Montana Supreme Court distinguished exculpatory clauses, releases, and

disclaimers of liability from indemnity agreements because "the former den[ies]

the victim any redress by cancelling liability altogether, while the latter leave[s]

liability unimpaired but shift[s] the ultimate incidence of the loss to others."

*Haynes*, 517 P.2d at 377.  Thus, "[u]nlike exculpatory clauses and releases,

ordinarily 'contracts of indemnity purporting to relieve one from the results of his

failure to exercise ordinary care are not contrary to public policy.'"  *Id.*

In *Ryan*, the parties entered into a lease agreement providing that Ryan

would "indemnify and save Great Northern harmless for any and all personal

injuries, damages, claims, suits, costs and recoveries of every name and nature

which may in any manner arise or grow out of the business conducted by Ryan on

the leased premises. . . ."  294 F.2d at 631.  A third party was injured on the

premises and sued Great Northern, who tendered defense of the action to Ryan.

*Id.* at 631–632.  Ryan refused to defend and brought suit against Great Northern,

arguing, among other things, that the lease agreement's indemnity clause was void

as against public policy.  *Id.* at 633–634.  The Ninth Circuit disagreed and upheld

the agreement, which clearly and unequivocally required Ryan to indemnify Great

Northern.  *Id.* at 634.

-22-

The Court agrees with BNSF that there is a difference between exculpatory clauses and indemnification agreements under Montana Code Annotated § 28–2–702.  An exculpatory clause effectively denies recovery to an injured party by "cancelling liability altogether."  This complete lack of redress underlies the public policy behind § 28–2–702.  However, an indemnity clause simply shifts financial responsibility for a third party's loss from one entity to another.  Hence, an indemnity provision of this nature is nothing more than a private contract of insurance.

Here, as in *Haynes* and *Ryan Mercantile*, the indemnity provisions do not cancel liability and preclude Mr. Fox from recovering for his injuries.  BNSF and TKDA are two sophisticated business entities with equal bargaining power that have the contractual right to limit their respective remedies and liabilities.  The two parties are free to allocate the risk of economic loss associated with TKDA's performance under the 2001 Agreement.  Mr. Fox, as a third party, is able to obtain redress under the 2001 Agreement, but that redress is shifted from BNSF to TKDA.  This shifting effect is not contrary to Montana public policy.  Consequently, because there is no issue of material fact and the law permits only one conclusion, TKDA's motion for summary judgment that Montana Code Annotated § 28–2–702 invalidates the indemnity provisions in the 2001

Agreement is denied.

### B.     Montana Code Annotated § 28–2–2111

In the alternative, TKDA argues that if the indemnity provisions are valid under Montana Code Annotated § 28–2–702, they are not valid under Montana Code Annotated § 28–2–2111.  Montana Code Annotated § 28–2–2111 was enacted on July 1, 2003, and addresses the enforceability of indemnity provisions in construction contracts.  It reads as follows:

**28–2–2111. Construction contract indemnification provisions.**

(1)     Except as provided in subsections (2) and (3), a construction contract provision that requires one party to the contract to indemnify, hold harmless, insure, or defend the other party to the contract or the other party's officers, employees, or agents for liability, damages, losses, or costs that are caused by the negligence, recklessness, or intentional misconduct of the other party or the other party's officers, employees, or agents is void as against the public policy of this state.

(2)     A construction contract may contain a provision:

    (a)     requiring one party to the contract to indemnify, hold harmless, or insure the other party to the contract or the other party's officers, employees, or agents for liability, damages, losses, or costs, including but not limited to reasonable attorney fees, only to the extent that the liability, damages, losses, or costs are caused by the negligence, recklessness, or intentional misconduct of a third party or of the indemnifying party or the indemnifying party's officers, employees, or agents; or

    (b)     requiring a party to the contract to purchase a project-specific insurance policy, including but not

limited to an owner's and contractor's protective insurance, a project management protective liability insurance, or a builder's risk insurance.

(3)     This section does not apply to indemnity of a surety by a principal on a construction contract bond or to an insurer's obligation to its insureds.

(4)     As used in this section, "construction contract" means an agreement for architectural services, alterations, construction, demolition, design services, development, engineering services, excavation, maintenance, repair, or other improvement to real property, including any agreement to supply labor, materials, or equipment for an improvement to real property.

TKDA argues that the 2001 Agreement is a "construction contract" for purposes of § 28–2–2111, and that because the 2001 Agreement was renewed after 2003, the statute is enforceable.  BNSF claims that the 2001 Agreement was never renewed and even if it was, the statute is not intended to impact work that had been done prior to the 2003 enactment date.  BNSF cites to Montana House Bill 482's Fiscal Note and explains that when the Fiscal Note mentions past projects with latent defects, it did not indicate that the bill would have an impact on projects completed before this law took effect.  (Doc. 35-1.)  The Fiscal Note further stated that such contracts would not have coverage anyway due to completed operations exclusions in most policies.  (*Id.*)

The Court has already determined that the 2001 Agreement was renewed

under the 2003, 2004, 2005, 2006, 2008, and January 21, 2009 renewals. However, what is of most importance here is when the contractual work was performed. TKDA performed its work on the Whitefish fuel unloading dock in 2002—that fact is undisputed. Montana Code Annotated § 28–2–2111 does not indicate that it should retroactively impact a contractual indemnification agreement for work completed prior to 2003, and the Fiscal Note implies that completed work does not fall under the statute. Therefore, since the work at issue was performed prior to the statute's enactment, § 28–2–2111 is not triggered. TKDA's motion for summary judgment that Montana Code Annotated § 28–2–2111 invalidates the indemnity provisions in the 2001 Agreement is denied.

Accordingly, IT IS ORDERED that:

(1)   TKDA's motion for partial summary judgment regarding the application of Montana law (Doc. 24) is GRANTED.

(2)   BNSF's cross-motion for summary judgment striking TKDA's defense under Montana Code Annotated § 28–2–2111 (Doc. 34) is DENIED.

(3)   TKDA's motion for summary judgment regarding the invalidity of indemnity and release of claims provisions (Doc. 42), and Safe I and Safe II's joinder in that motion (Docs. 46, 47) are DENIED.

DATED this 5th day of April, 2017.

_____
Dana L. Christensen, Chief District Judge
United States District Court